**CRUZ v. HARKNA et al.**

**THE MERIDA.**

United States District Court, S. D. New York.
May 7, 1954.

Norman C. Harlowe, New York City, for libellant. Herbert J. Kaplow, of counsel.

Hanrahan & Brennan, New York City, for respondents. William R. Brennan, Jr., New York City, of counsel.

CONGER, District Judge.

In this case I decided that the libellant could not recover under the Jones Act, 46 U.S.C.A. § 688, but I would accept jurisdiction under the General Maritime Law and that recovery could only be under the Honduran law (see opinion rendered in open court on February 24, 1954). Since then libellant has proven the Honduran law.

Normally, I believe the procedure would be to send libellant back to Honduras to present his claim but it appears that libellant was never a resident of Honduras and the statute of limitation has run against his claim in Honduras. It further appears that libellant is soon to be deported to Portugal.

In all equity it would seem to me that this Court should grant libellant whatever relief he is entitled to under the facts.

The applicable Honduran law (Chapter XI of Decree 55) is in essence a compensation act. The amount of recovery for various injuries and illnesses is fixed.

Chapter XI is entitled "Compensation for Maritime Labor Accidents." Article 33 of Chapter XI provides that Articles 34–53 are applicable to all "sickness or labor accidents suffered by the officer and member of the crew * * *."

Article 34 provides that officers and members of the crew who "should become sick on board in the service of the vessel or who should suffer any injury or temporary or permanent incapacity caused by a maritime labor accident should have the right to receive from his employer the compensation established by law."

Section 35 defines a maritime labor accident "as any injury or body infection that the victim may suffer in the course or as a direct consequence of the work that he renders in the service or benefit of the vessel * * *."

I gather from the above that compensation is allowed a seaman who is taken ill while on the vessel (this parallels what we call maintenance and cure) or who suffers injury, wounds or body infection while on board. In neither case is negligence a factor.

Then follow Articles 36–40 inclusive, which define various types of injuries and incapacities which we are not particularly concerned with.

As I understand it, libellant claims total incapacity under Article 41 which provides incapacity as follows: "In all other cases the degree or class of incapacity suffered which may not be specified in Articles 38, 39, 40 shall be determined according to special circumstances of each case."

Article 42 provides for specified compensation to a member of the crew who shall become sick on board the vessel during the period of his contract.

Article 43 provides payment of certain expenses incurred by a member of the crew who may be a victim of a maritime labor accident.

Article 44 provides for specific payments of compensation to a member of the crew who suffered incapacity by reason of a maritime labor accident.

Libellant also claims that he is entitled to the benefits provided for by Article 42 (maintenance and cure).

Libellant, a member of the crew of the S. S. Merida, claims to have been injured on board the vessel on September 9, 1949; that while he was working in the engine room he was struck in the chest by a spare part of the propeller shaft which had been bolted to a wooden bulkhead and had broken loose. Libellant claims that this occurrence, coupled with the unseaworthy condition of the vessel including wet, damp and unhealthy living quarters along with the failure of the vessel to furnish him with adequate, prompt medical care and attention on board the vessel and subsequent thereto were the producing causes of a hernia and a chest or lung condition which he claims he suffered and from which he states he is still suffering. Libellant claims that within two days after the accident he had a fever and a cough; that he was unable to work but that the captain or the chief engineer ordered him to do so.

I am not convinced that libellant was laid up to any great extent after the alleged accident. My recollection is that he was sick for some cause which I am unable to determine from the testimony for about 6½ days from on or about September 2, 1949 to September 8, 1949. It also appears from libellant's overtime record that from September 9, 1949 to November 8, 1949 he did some overtime work.

As to the hernia, libellant has failed to prove to me that the hernia was caused by the accident. My notes fail to indicate that libellant's doctor-expert so stated.

I find that he did have a hernia while on the vessel. It is common knowledge that hernia may be caused in various ways. Coughing or any sudden strain or exertion may cause it. Libellant testified he had no hernia when he started on the voyage and that he was examined by a doctor for the ship before sailing and none was found.

He did have a hernia, however. The doctor at Rotterdam so found. This hernia, in my opinion, was not disabling. It is common knowledge that many men with hernia work. It is not wise, however, to do so. The hernia may become incarcerated, as libellant's did, but that was not until January 14, 1951 when libellant was in the hospital being examined for his lung condition. An emergency operation was then and there performed. The post-operative course was uneventful.

Assuming that living conditions on the ship were bad and that there was a failure to treat it I am of the opinion that this condition of libellant was in no way worsened thereby.

It might be well to note at this point that the doctor who examined libellant at Rotterdam stated quite positively that libellant made no complaint to him of a chest or lung condition.

The question submitted to the doctor was, "7. State whether Mr. Cruz complained of a chest or lung condition at the time of your examination." And the answer, "Seventh: To the seventh interrogatory he saith; No, definitely not." The doctor further testified, "I may have said that he could also wait until the ship was in the United States, but I do not think so; I advised operation here. An operation for a rupture in the groin is not serious and postponement is possible." The note which the doctor gave libellant simply stated, "J. Cruz, fireman left inguinal rupture." Nothing was said about an operation.

As to the living conditions on the ship, I feel that libellant has failed to prove his contentions. The ship was registered with Lloyds as A 100, which I understand is a high rating. The Captain said he ate the same food as the men and it was good. The vessel had

been reconditioned by the United States during the war. Under all the facts I feel libellant has not made out a case in this respect.

On the trial libellant produced a medical expert, who testified that libellant has a stenosis of the left main stem bronchus with complete collapse of the left lower lobe of the lung. He also testified that the libellant had this condition while he was on board ship.

As I understand it, it is for this condition mainly with its attendant results that libellant is here asking damages.

Assuming that the accident as claimed by libellant did occur, I rule *that* out as a competent producing cause of libellant's condition. Libellant's doctor stated that he reported to libellant's attorney that the injury to the chest did not cause his condition but that conditions on the ship might cause a recurrence of an old condition. It is difficult to say with any certainty just what libellant's condition was while he was on the ship and what it was when he signed off. We have only his story. He said after the accident he was black and blue over the chest but after two days was told to go to work; that he had a fever and a cough; that when they reached Rotterdam he asked the Captain to take him to a doctor; that while the doctor was examining him he told him of his condition, of the pain in the chest and groin and the cough; that later he felt bad; that he had pain in his chest and groin; that he felt bad and told the Captain but nothing was done for him; that later on he had bad coughing and fever; that he missed many watches. As I say, there is only libellant's story. Both the Captain and the Chief Engineer testified that they had no recollection of libellant complaining of any serious illness or of making any complaints of illness. The log books show nothing either, except that libellant missed the watches which I have referred to above.

Libellant's work record does not corroborate him. The log books show that libellant worked 97 hours overtime from September 9 to November 8, 1949. The doctor at Rotterdam does not help libellant either. As I have set forth above, he stated the libellant only complained to him of a left inguinal hernia.

Libellant states that when he left the ship he asked the Captain for hospitalization but that the Captain did not honor the request. The Captain testified that libellant did not ask him for hospitalization when he signed off and that libellant was signed off with all of the crew because the vessel was being laid up.

Libellant's medical history is meager for some time after he left the ship (November 18, 1949). He said he was feeling bad and was alone but did go to his niece's home in Brooklyn the day before Christmas. His niece testified that libellant came to live with her before Christmas of 1949. She was very indefinite as to dates. She said libellant was sick and was vomiting blood and pus; that about Christmas time she had him taken to Dr. Locovara, a physician in the neighborhood. We have no report from Dr. Locovara, neither did he testify. The testimony is . that libellant stayed with his niece for about a year during which time he had no doctor although he claims to have been ill during all of that time.

The record before me indicates that on November 8, 1950 libellant came to the Fort Greene Chest Clinic (operated by the City of New York). On the admission record of the clinic we find the following history—"Present illness" "No cough. Has pain in stomach. Otherwise no complaint."

Libellant called at the clinic four or five times as the record shows. He was then sent by the doctor in charge of the Beth-El Hospital for study of an atelectatic left lung which had been noted in the X-ray film taken at the clinic.

Libellant was received at the chest clinic of the Beth-El Hospital where he was X-rayed and recommended for admission to the hospital. He was admit-

ted to the hospital on January 5, 1951 and discharged February 2, 1951.

The hospital "History Sheet" states that it was difficult to obtain history because of language difficulties but it does state that in October, 1949 patient started to complaint of epigastric pains and one month later he started to cough. November, 1949 he left the ship on which he was working as a fireman. Consulted his M. D. He advised operation on the stomach. Since then Pt. complains of epigastric distress, nausea. Lately he has been having nausea and coughing steadily. He brings up a brownish sputum. No blood expectoration.

His condition when he left the hospital was diagnosed as follows: a contracted left chest dullness and rhonchi. X-rays showed marked contraction of left lung with heart shifted into the left chest together with sacculated bronchiectasis in upper field.

The hospital record also states 2/2/51 the chest conference at the hospital agreed that left pneumonectomy (partial removal of the lung) was indicated for suppurative lung. They advised libellant to be discharged for a few weeks to permit recovery from the hernia operation.

The record does not disclose that libellant ever went back to the hospital.

Respondents produced a medical expert, a specialist in this type of medical science. He testified that he examined libellant in December, 1953. He stated he found him normal in most respects except that he stated that libellant had a left fibro thorax, the result of stenosis of the left main bronchus, the left chest shrunken, the interspaces narrowed, with the heart pulled to the left.

He stated that he agreed with libellant's expert except that he found no abscess and that he did not agree with the hospital's diagnosis that libellant had a suppurative left lung. This doctor stated that libellant had a longstanding chronic condition and that he will always be that way; that libellant had this condition when he was in the Marine Hospital at Staten Island in 1945.

Libellant entered the Marine Hospital on July 22, 1945 and was discharged as fit for sea duty on October 30, 1945 with his condition on discharge unchanged.

Libellant had been sent to the hospital because of a routine examination. Tuberculosis was suspected. At the hospital libellant denied all symptoms and stated on admission he had never been ill and denied all symptoms referable to his chest.

The hospital record shows libellant's condition to be as follows: X-ray of his chest showed atalectasis of the left lung with the heart drawn completely to the left side of the chest: sputum clear: negative for tubercle bacilli. He was bronchoscoped and a complete stenosis of the left stem bronchus was found. The record also states that "It was believed that the most likely diagnosis was healed tuberculosis of the right bronchus."

There is no record of libellant being disabled or ill from the date of his discharge from the United States Hospital until the happening of the illness of which he now complains, although libellant had worked steadily on ships.

Respondents' medical expert testified that libellant's condition is a chronic condition; that it is the same now as it was in July, 1945; that the X-rays of libellant's chest taken at the Government Hospital in 1945 show the same condition of the chest and lung as depicted on the X-rays taken by this doctor in 1953; that the claimed accident on board ship did not cause it; that the claimed accident and claimed bad conditions on board the ship did not aggravate libellant's condition; that it was impossible to do so.

This witness further testified that libellant's present condition was many years in the making.

This witness summed up the picture as follows: The blood count was normal; no sign of infection; libellant did

not cough at any time in the doctor's presence during the examination; that all of his complaints were subjective; that he has a process which the doctors term fibro thorax, a result of long-standing scarring, with contraction and pulling over of the heart into the left chest, together with the trachea; chest deformed and shrunken; that this is a chronic condition of long standing and this condition will always be that way. He further testified that libellant is able to work but that he will have to be convinced because he is convinced that he is ill.

Libellant's medical expert testified that libellant's left lung would have to be removed and that medical science can do no more for him.

Respondents' medical expert disagrees sharply with this prognosis. He stated positively that this operation must not and should not be done. He illustrated by X-rays of some of his patients that a person could exist, live and get along alright with the infirmity that libellant has. As I recall it, he stated, "Of course, he will only have one lung but he can live for years."

The doctor showed an X-ray of his own secretary, taken in 1931, which showed the same condition found in libellant. After 31 years his secretary was still working and recent X-rays showed no change.

He showed other examples by X-rays; one, a woman with no change after 18 years; another one with no change since 1945. He cited other instances and used X-rays in demonstrating that there were no changes after many years. I was quite impressed with this demonstration and am inclined to agree with this doctor, although it is not necessary for me to pass on this disputed medical problem.

██ I have spent a great deal of time on this case and have written more than I should because it presented problems that were puzzling and not easily solved. I have finally come to the conclusion that the hernia was not caused by the alleged accident and that libellant's permanent infirmity of the chest, the heart, the left lung and the bronchus was not caused or brought about or aggravated by any accident on board the vessel nor by any alleged bad living conditions on board, neither do I think that failure to treat in any way affected the condition. Libellant's infirmity had been of long standing, at least since 1945 and yet he worked steadily after that apparently without any disability.

██ I do think, however, that the hernia condition should have been looked after by the ship. The proof shows that the hernia occurred while libellant was on board the ship. The Captain knew of it. The libellant was entitled to medical care as to this when he signed off.

I am assuming that libellant asked for hospitalization when he was signed off. I also feel that libellant was ill when he left the ship. True, his medical history is not too convincing particularly for a year after he left the ship but I feel this way: in all justice and equity, considering all the facts and circumstances, libellant should have been hospitalized to have the hernia operation and for a reasonable time for the illness from which he was suffering when he left the vessel, not on the theory that the permanent condition could be cured or that he was entitled to a cure therefor. But, at least he could have rest and treatment which would build up his resistance.

I feel that respondents should pay the expense of the hernia operation and maintenance during the recovery period.

I feel also that libellant should have maintenance for a reasonable period because of his illness during which time he would be unable to work. I fix the entire maintenance at one year.

Respondents should also pay libellant's hospital bill at Beth-El Hospital.

If the attorneys are unable to fix the amounts due I will fix them when the decree is signed.

Settle decree.